IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARIE SHANTE BOX,

    Plaintiff,

      v.

WILLIAM CAUSEY, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:24-CV-3766-TWT

**OPINION AND ORDER**

This is a personal injury action. It is before the Court on Defendants William Causey, CTS National Corporation ("CTS"), and Old Republic Insurance Company's ("ORIC") Motion for Partial Summary Judgment [Doc. 54] and Motion to Exclude [Doc. 56] as well as Defendant ORIC's Motion for Summary Judgment [Doc. 55]. For the reasons set forth below, the Court GRANTS Defendants Causey, CTS, and ORIC's Motion for Partial Summary Judgment [Doc. 54] and DENIES their Motion to Exclude [Doc. 56]. The Court additionally GRANTS Defendant ORIC's Motion for Summary Judgment [Doc. 55].

T:\ORDERS\24\Box\msjtwt.docx

I. Background[1]

This case arises from a motor vehicle collision between Plaintiff Marie Shante Box and Defendant William Causey in May 2023. (Defs.' Statement of Undisputed Material Facts ¶ 1 [Doc. 54-2].) Following the collision, Box filed suit against Causey, CTS National Corporation (Causey's employer), and Old Republic Insurance Company (CTS's insurer). She seeks compensatory damages for her injuries, punitive damages, and attorney's fees. (Compl. at 8.) To support her compensatory damages claims, Box has retained Dr. Thomas Pontinen as an expert witness. Dr. Pontinen's expert report opines that Box's future medical and life care will cost $822,2218.55. (Defs.' Mot. to Exclude, Ex. 2 ("Pontinen Expert Report"),[2] at 31 [Doc. 56-2].)

II. Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H.*

---

[1] The operative facts on the summary judgment motions are taken from the Defendants' Statements of Undisputed Material Facts, to which the Plaintiffs did not respond. The Court will therefore deem the Defendants' factual assertions, where supported by evidentiary citations, admitted under Local Rule 56.1(B).

[2] The pagination of Dr. Pontinen's report reflects the PDF pagination.

2

*Kress & Co.*, 398 U.S. 144, 158–59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Despite the Defendant's lack of opposition, the Court "cannot base the entry of summary judgment on the mere fact that the motion [i]s unopposed, but, rather, must consider the merits of the motion." *United States v. 5800 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). In considering the merits, the Court "need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials." *Id.*

"Under Federal Rule of Evidence 702, expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and

3

helpfulness requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The goal of this gatekeeping role is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified).

### III. Discussion

#### A. Motions for Summary Judgment

In their joint Motion for Partial Summary Judgment, the Defendants seek judgment as a matter of law as to Box's claims for attorney's fees and expenses (Count V) and punitive damages (Count VI). As stated in her response brief, Box now seeks to dismiss Counts V and VI.[3] (Pl.'s Resp. Br. to Defs.' Mot. for Partial Summ. J., at 1 [Doc. 58].) Georgia authorizes attorney's fees and expenses against a defendant that "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and

---

[3] The Court notes that a plaintiff cannot amend his or her complaint in an opposition brief, regardless of whether the plaintiff seeks to add or withdraw certain claims. *Felder v. Charles Schwab & Co.*, 2022 WL 22878522, at *3 (M.D. Fla. Aug. 10, 2022) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). The Court will therefore rule on the Defendants' summary judgment motion here, as well as below.

4

expense." O.C.G.A. § 13-6-11. Georgia also authorizes punitive damages "in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Finding no evidence in the record suggesting that either standard is satisfied, the Court holds that the Defendants are entitled to judgment as a matter of law on Counts V and VI.

In its separate Motion for Summary Judgment, Defendant Old Republic Insurance Company seeks judgment as a matter of law as to Box's claim of ORIC's motor carrier liability (Count IV). Box explains in her response brief that she now seeks to dismiss her claim against ORIC. (Pl.'s Resp. Br. to Def. ORIC's Mot. for Summ. J., at 1 [Doc. 59].) Looking to the merits of the motion, the Court agrees with ORIC that it is entitled to judgment as matter of law on Count IV.

Box's claim against ORIC relies on a Georgia statute that provides for direct action against the liability insurer of a "motor carrier." (Compl. ¶ 33 (citing O.C.G.A. § 40-2-140).) A motor carrier includes persons "owning, controlling, operating, or managing any motor vehicle . . . used in the business of transporting for hire persons, household goods, or property . . . over any public highway in this state." O.C.G.A. § 40-1-100(12). The key phrase is that

5

the motor vehicle is "used in the business of transporting for hire." An entity is not a motor carrier if it uses a commercial vehicle to "exclusively . . . transport its own products," does not hold itself out "for hire to the public" to transport products, and "is not used or hired by the public for the transportation of either goods or people." *Nat'l Union Fire Ins. Co. v. Sorrow*, 202 Ga. App. 517, 518 (1992).

CTS is not a motor carrier under that statute. Here, Causey was transporting Sherwin-Williams's products in the course of his employment with CTS. (Def. ORIC's Statement of Undisputed Material Facts ¶ 5 [Doc. 55-2].) CTS is a subsidiary of Sherwin-Williams, only transports Sherwin-Williams's goods, and does not hold itself out to the public as transportation for hire of any goods. (*Id.* ¶ 7.) Like the company in *National Union Fire Insurance*, CTS does not qualify as a motor carrier for the purposes of ORIC's liability. Therefore, the Court grants summary judgment in favor of Defendant ORIC as to Count IV.

B. Motion to Exclude[4]

Dr. Thomas Pontinen "is a double-board certified anesthesiologist and interventional pain medicine specialist" and is certified as a "Life Care

---

[4] Box's opposition brief does not comply with Local Rules 7.1(B) and (D) because it was filed six days too late and is six pages too long. That being said, the Court will consider Box's opposition brief in full in this instance. The Court cautions, however, that Box must adhere to the Local Rules going forward.

Planner." (Pontinen Expert Report, at 5.) He regularly provides life care planning services through a company called LCP Pro, LLC ("LCP Pro"), and his expert report in this case sets out a recommended life care plan for Plaintiff Box. (Pontinen Aff. ¶¶ 56–59 [Doc. 60-1].) A life care plan "identif[ies] the residual medical conditions and ongoing care requirements of ill/injured individuals" and "quantif[ies] the costs of supplying these individuals with requisite, medically related goods and services throughout probable durations of care." (Pontinen Expert Report, at 7.)

Ultimately, the Court denies the Defendants' Motion to Exclude. The Defendants seek to exclude Dr. Pontinen's opinions on the grounds that he is not qualified and that his methodology is not reliable. (Defs.' Mot. to Exclude, at 9–10 [Doc. 56].) As to qualifications, the Defendants argue that Dr. Pontinen is not qualified to opine on Box's life expectancy, (*id.* at 15). As to reliability, they argue that Dr. Pontinen (1) failed to follow "standard treatises that establish[] the methodology for creating life care plans," (*id.* at 13); and (2) relied on medical cost information from a proprietary database owned by LCP Pro that cannot be "peer reviewed and tested for validity," (*id.* at 14). These arguments are unavailing for the below reasons.

1. **Qualifications**

The Defendants seek to exclude Dr. Pontinen's opinions because his life care plan includes an estimate of Box's life expectancy, which they argue Dr.

7

Pontinen is not qualified to calculate. (Defs.' Mot. to Exclude, at 15.) They claim that "[a] life expectancy expert[ ] or an economist must provide these [life expectancy] calculations" and that "otherwise it is misleading to the jury." (*Id.*) They further rely on their own expert witness, Dr. Ashley Grzybowicz, for the proposition that "established life care planning standards" require a life expectancy expert or an economist to perform life expectancy calculations. (*Id.*)

The Court holds that Dr. Pontinen is qualified to opine on Box's life expectancy, as one component of Box's life care plan. As part of the life care planning calculations, Dr. Pontinen estimated that Box would live an additional forty years. (Pontinen Expert Report, at 28.) His life expectancy estimate is based on the Center for Disease Control's ("CDC") 2023 National Vital Statistics Report on life expectancy for the U.S. population. (*Id.* (citing Elizabeth Arias, Jiaquan Xu, and Kenneth Kochanek, *United States Life Tables, 2021*, Nat'l Vital Stats. Reports, Nov. 7, 2023, at 14 tbl. 1).) Dr. Pontinen explains that estimating life expectancy using these CDC reports is "accepted methodology" in the life care planning industry. (Pontinen Aff. ¶ 24; *see also id.* ¶ 26 (describing his use of the CDC's reports as an "industry-standard expectation").) Dr. Grzybowicz's opinions to the contrary are not sufficient to justify excluding Dr. Pontinen's opinions in whole or part. As mentioned above, Dr. Pontinen is a certified life care planner who provides services through a life care planning company, which regularly provides life

8

expectancy estimates as part of its process. Other courts have found certified life care planners qualified to rely on their life expectancy calculations as part of creating a life care plan. *See e.g.*, *Mincey v. Se. Farm Equip., Co.*, 2025 WL 2450913, at *11 (D.S.C. Aug. 26, 2025); *see also Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1353 (M.D. Ga. 2015) (declining to find a life care planner unqualified to opine on future life expenses even though the life care planner was not certified). And Defendants do not point to—and the Court is not aware of—case law that requires an expert witness to be a life expectancy expert or economist in order to rely on a life expectancy estimate.

### 2. Reliability

The Defendants point to Dr. Grzybowicz's expert testimony to argue that Dr. Pontinen's methodology is unreliable. Dr. Grzybowicz identifies the Life Care Planning and Case Management Handbook as an "authoritative treatise[ ] which life care planners should follow when preparing life care plans, and she additionally points to consensus statements published in the *Journal of Life Care Planning*." (Def.'s Mot. to Exclude, at 13 (citations omitted).) According to Dr. Grzybowicz, the standards outlined in these authorities "require collaboration with the evaluee's medical providers" and transparent pricing. (Defs. Mot. to Exclude, at 14.) The Defendants argues that Dr. Pontinen did not comply with these standards because (1) he did not collaborate with Box's primary treating physician and (2) his pricing model

9

relied on proprietary data.[5] (*See* Defs.' Mot. to Exclude, at 14.)

The Court holds that Dr. Pontinen's methodology is reliable for *Daubert* purposes. There is no one required methodology in the life care planning industry. Dr. Pontinen explains that his methodology (and LCP Pro's) is based on "peer-reviewed, published methodologies and Standards of Practice within the life care planning associations," including the American Academy of Physician Life Care Planners, International Academy of Life Care Planners, and American Association of Nurse Life Care Planners. (Pontinen Expert Report, at 8.) At a high level, the methodology generally includes

> a pre-assessment questionnaire, review of provided records, development of a medical chronology, virtual and/or telephonic assessment of the client and significant other (where applicable), collaboration with providers (where applicable), medical research (where applicable), cost research, determination of future care with associated costs, and finalization of the Life Care Plan report.

(*Id.*)

Regarding the relationship between Dr. Pontinen and Box's primary treating physician, the Court finds that the lack of formal collaboration between the two is not sufficient to render Dr. Pontinen's methodology unreliable. Dr. Pontinen testified that he attempted to contact the office of

---

[5] The Defendants also argue that Dr. Pontinen's opinions are unreliable because only a "qualified expert" can calculate Box's life expectancy and Dr. Pontinen is not qualified as such. (Defs.' Mot. to Exclude, at 14.) Having already found Dr. Pontinen's life expectancy calculations consistent with standard practice within the life care planning industry, the Court declines to find Dr. Pontinen's methodology in this area unreliable.

Box's primary treating physician multiple times without success but ultimately determined that, because the treating physician's records were "very clear and complete," further attempts were unnecessary. (*See* Defs.' Mot. to Exclude, Ex. 1 ("Pontinen Dep."), at 69:1–20; 72:8–24 [Doc. 56-1].) He explained that treating providers "often" do not respond to requests regarding future care but that he and other life care planners "do [their] best to try to obtain as much information as possible." (Pontinen Dep. at 68:9–18; *see also id.* at 69:11–15 ("A lot of times, we don't get a response. We'll send multiple letters and phone calls, but . . . it's just difficult sometimes to get ahold of treating providers. And so his office did not reply.").) Dr. Pontinen stated that his process nonetheless satisfied standard industry procedure and included "review[ ] [of] Ms. Box's provided medical records, development of a medical chronology of Ms. Box's medical care, a virtual assessment of Ms. Box in an in-depth interview conducted via Google Meet, medical research, cost research, and a determination of Ms. Box's future care with associated costs." (Pontinen Aff. ¶¶ 40; Pontinen Expert Report, at 8–9; Pontinen Dep. at 28:10–29:5.)

While the record in this case indicates that collaboration with physicians is recommended within the life care planning industry, the record does not support the notion that a life care planner's failure to collaborate renders his or her methodology unreliable. Dr. Grzybowicz cites documents that merely emphasize the general importance of collaboration within the life care

11

planning industry. For example, Dr. Grzybowicz cites one statement from the International Academy of Life Care Planners that provides as follows: "[T]he best life care plans depend on input from a variety of professionals. . . . [The document] reflects the collaborative coordination of several professionals." (Grzybowicz Expert Report, at 13.) She also points to a *Journal of Life Care Planning* article that considered standards offered by three different life care planning associations and concluded that "collaboration is seen throughout all three standards of practice, reinforcing the interdisciplinary nature of life care planning." (*Id.* at 14.) Dr. Grzybowicz's reference to other standards regarding collaboration—such as "Life Care Plans shall rely upon medical/allied health professional opinions" and "[International Commission on Health Care Certification] Certificants shall collaborate as a team with allied professionals in formulating reports when applicable"—are similarly too generalized to require excluding Dr. Pontinen's opinions. (*See id.* at 13–14.)

Even if the Defendants could identify some document that expressly requires collaboration with every treating physician, that would still be insufficient. As Dr. Grzybowicz acknowledges herself, various life care planning associations maintain their own life care planning standards, meaning that life care planners may have different processes from one another. (Defs.' Mot. to Exclude, Ex. 4 ("Grzybowicz Expert Report"), at 14 [Doc. 56-4]; Defs.' Mot. to Exclude, Ex. 3 ("Grzybowicz Dep."), at 19:23–20:13, 29:24–30:10

12

[Doc. 56-3].) Thus, a collaboration requirement in one methodology does not automatically negate the reliability of another methodology that encourages collaboration only "where applicable"—as LCP Pro's and Dr. Pontinen's methodology does. To the extent Dr. Pontinen and Dr. Grzybowicz disagree on what constitutes acceptable practice on this topic, that is a question of credibility rather than admissibility. *See Woodall v. W. Express, Inc.*, 2025 WL 1191783, at *2 ("District courts within the Tenth Circuit have found that alleged shortcomings in the data used to create life care plans go to the weight, not the admissibility, of the life care plan and testimony of the life care planner.").

Regarding pricing databases, the Court finds that Dr. Pontinen's opinions should not be excluded for relying in part on LCP Pro's proprietary database. Dr. Pontinen's report explains that he obtained his life care cost estimates "through methods accepted and utilized in the Life Care Planning industry," including the following:

> 1) actual charges from the client's providers that are considered recent within the last 24 months (when available); 2) median of the 70–80% percentile of UCR charges obtained from three national costing databases (Practice Management Information Corporation Medical Fees Directory (PMIC), Physicians Fee Reference (PFR), and Medata) adjusted to the client's zip code/geographical area; 3) internet research with suppliers, facilities, pharmacies, and vendors; and/or 4) LCPpro®'s proprietary database (Median Cost Research) specific to the cost of injections and surgeries.

(Pontinen Expert Report, at 10; *see also id.* at 10–11 (further detailing the

13

pricing methodology).) For each future care need and cost identified (e.g., surgeries, physical therapy, MRIs), Dr. Pontinen also listed the specific source for his cost estimate (e.g., actual records, national costing databases, LCP Pro's proprietary costing database). (*Id.* at 29–31.)

The Defendants take issue with Dr. Pontinen's reliance on LCP Pro's proprietary costing database, arguing that it is inconsistent with industry standards that require transparent and verifiable data.[6] (Defs.' Mot. to Exclude, at 14–15.) To support their claims regarding industry standards, they cite Dr. Grzybowicz's expert report. For example, Dr. Grzybowicz points to the following standard in the Life Care Planning and Case Management Handbook: "The life care planner uses a consistent, valid, and reliable approach to costs." (Grzybowicz Expert Report, at 16.) The Handbook further identifies "practice competencies" for that standard such as "[i]dentifies services and products from reliable sources" and "[c]ites verifiable cost data." (*Id.*) She also cites a statement in the *Journal of Life Care Planning* providing that "Life Care Planning products and processes shall be transparent and

---

[6] The Defendants also appear to argue that Dr. Pontinen's opinions should be excluded as unreliable because the *Daubert* factors require peer review and peer review is unavailable for LCP's database. (Defs.' Mot. to Exclude, at 14.) But the Court agrees with Box that one of *Daubert*'s reliability factors is peer review of the expert's *methodology*, not peer review of each individual data source relied on as part of that methodology. (*See* Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude, at 26 [Doc. 60].) For the reasons explained elsewhere, the Court finds Dr. Pontinen's methodology of relying on a mix of actual medical records and costing databases reliable.

14

consistent," with "[b]est practices" including "[v]erifiable data from appropriately referenced sources." (*Id.*) Dr. Grzybowicz also states that it is unclear whether LCP Pro's database adheres to additional standards requiring life care planners to "consider the integrity of data"; "utilize a reliable, consistent method for reaching conclusions"; "gather geographically relevant & representative prices"; rely on "databases, templates and software" with "appropriate foundation." (*Id.* at 16.)

Although Dr. Grzybowicz has shown that life care planning best practices include using "reliable" and "verifiable" data, the Court is not persuaded that LCP Pro's database is unreliable or unverifiable within the industry nor that Dr. Pontinen's use of a proprietary database renders his methodology unreliable for *Daubert* purposes. Dr. Pontinen relied on Box's actual bills or provider estimates where possible and costing databases, such as those by the Practice Management Information Corporation and LCP Pro, where not. (Pontinen Aff. ¶ 29.) He provided nineteen cost estimates based on individual future needs. (*See* Pontinen Expert Report, at 29–31.) Three of those estimates were derived from LCP Pro's database. (*See id.*) LCP Pro's database contains data from "more than 2,000 cases" and is "based on actual provider charges and actual provider estimates for injections and surgeries." (Pontinen Expert Report, at 11.) It "utilizes information from the last 24 months to identify the median charge from its extensive database." (*Id.*) According to Dr.

15

Pontinen, this method "was peer reviewed and acknowledged as being widely used and accepted by more than 50 practicing Life Care Planners on August 22, 2025," and the general method of "utilizing charges from actual providers is also widely used and accepted within the life care planning industry." (Pontinen Aff. ¶ 36.) In light of this information, the Defendants' reference to general standards of reliability is insufficient to show that Dr. Pontinen's use of the LCP Pro database fails to adhere to industry standards. The Court therefore concludes that Dr. Pontinen's methodology for employing pricing databases, including LCP Pro's proprietary database, is consistent with standards in the life care planning industry and *Daubert*. *See, e.g., Rodrigue v. Nat'l Ins. Co.*, 2021 WL 3284254, at *2, 5 (E.D. La. July 2, 2021) (declining to exclude as unreliable the testimony of a life care planner who relied in part on "proprietary and confidential sources"). Any further disagreement regarding the accuracy of Dr. Pontinen's individual cost estimates speaks to the weight of the testimony rather than its admissibility, as competing expert witnesses often supply different cost estimates from one another.

## IV. Conclusion

For the reasons set forth above, the Court GRANTS Defendants William Causey, CTS National Corporation, and Old Republic Insurance Company's Motion for Partial Summary Judgment [Doc. 54] and DENIES their Motion to Exclude [Doc. 56]. The Court additionally GRANTS Defendant ORIC's Motion

for Summary Judgment [Doc. 55].

SO ORDERED, this ___2nd___ day of December, 2025.

                                                THOMAS W. THRASH, JR.
                                                United States District Judge